PUBLIC SAFETY EMPLOYEES
ASSOCIATION, Appellant,

Alaska Labor Relations Agency,
Amicus Curiae,

v.

STATE of Alaska, Appellee.

No. S–3151.

Supreme Court of Alaska.

Oct. 5, 1990.

William K. Jermain and James A. Gasper, Jermain, Dunnagain & Owens, P.C., Anchorage, for appellant.

Robert M. Johnson and James A. Sarafin, Wohlforth, Arcetsinger, Johnson & Brecht, Anchorage, for amicus curiae.

Joseph W. Geldhof, and Marjorie L. Odland, Asst. Attys. Gen., Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON, and MOORE, JJ.

RABINOWITZ, Justice.

## I. FACTS.

The Alaska Labor Relations Agency ("the Agency") convened a hearing on February 5, 1987 to consider unfair labor practice charges asserted by the Public Safety Employees Association ("PSEA") against the Department of Public Safety, State of Alaska ("State"). PSEA challenged reclassification of certain state trooper employees in the PSEA bargaining unit and consequent reassignment of those employees to a different bargaining unit.

In its order and decision, the Agency found the following facts. PSEA represents a bargaining unit comprised of specific public safety officers, including State troopers, employed by the State's Department of Public Safety. Since at least 1977, the PSEA bargaining unit has included nonpermanent "training classifications" among the titles within the regular commissioned public safety officers' bargaining unit.

PSEA and the State entered into a collective bargaining agreement effective January 1, 1984, which by its terms expired on December 31, 1985. PSEA and the State commenced negotiations for a renewed contract and the terms of the 1984–85 PSEA–State contract were continued by mutual agreement of the parties during the periods relevant to this appeal. The PSEA–State contract contained provisions governing wage rates and benefits applicable to temporary employees, grievance procedures, and management rights.

"State trooper recruit" was a training classification for nonpermanent employees of the State who were placed initially in the police academy at Sitka. There they received thirteen weeks of training. Historically, upon successful completion of the Sitka academy course, a trooper recruit would be assigned to a field training officer program for field training and would subsequently be employed as an Alaska state trooper, or as an employee of another law enforcement agency in the State.

At the end of 1984, State officials sought to implement a "law enforcement college intern program" in lieu of the trooper recruit program and commenced discussion of that program with principals of PSEA. PSEA and the State met and discussed the proposal but did not reach agreement. Until 1986, these discussions apparently assumed that the program, however labeled, would continue within the PSEA bargaining unit. Eventually, however, it became clear that the State could not ensure induction of academy trained officers into the State trooper system due to budgetary constraints. PSEA responded and maintained an apparent willingness to bargain over the overall terms and conditions of the revised program. These discussions involved interpretation of the parties' collective bargaining agreement.

By spring of 1986, the State and PSEA had not reached agreement on a recruit program. Unresolved issues included the linkage of different "classes" of employees within the same bargaining unit, and a potential reduction in PSEA dues. At that time, the State apparently determined that PSEA was not willing to agree with the provisions which the State desired concerning the State trooper recruit/intern employees. The State declared a "unilateral impasse" and stated that, for the 1986 class at Sitka, the State would implement the college intern program as it had proposed, with the 1986 college interns removed from the PSEA bargaining unit and placed in the Alaska Public Employee Association, General Government Unit ("APEA–GGU"). The State asserted a right to reclassify employees pursuant to general management prerogatives and took the position that any challenge to this reclassification should be resolved through a unit clarification petition. PSEA agreed that an impasse had been reached.

PSEA grieved the redesignation/reclassification of the State trooper recruits to the then Commissioner of Public Safety Robert Sundberg. Commissioner Sundberg responded in a letter dated May 27, 1986 and rejected the grievance, stating specifically:

*I do not consider this a grievance properly before me as the individuals in question do not belong to your bargaining unit.* Rather they are members of the general government bargaining unit and as such are subject to the continuing terms and conditions of that agreement. *Based upon this, the grievance is being returned unanswered.*

(Emphasis added.) PSEA admits that it did not then seek to appeal, or otherwise undertake to advance this "step 3" challenge[1] beyond Commissioner Sundberg to the "step 4" level with the Commissioner of Administration Andrews, because it considered that effort to be futile. PSEA asserts that previous responses by Commissioner Andrews to PSEA had in fact been drafted by the Division of Labor Relations, whose representatives had already taken the position that the State trooper recruits/interns could in fact be reclassified and redesignated.

The 1986 class of State trooper recruit/college interns commenced in May, 1986. Testimony from two participants in the 1986 academy program and testimony from prior participants in the academy program established no substantial or fundamental changes in the 1986 thirteen-week program from previous programs. The 1986 academy participants were not informed that the academy was deemed a college intern or college preparatory schedule. Witnesses before the Agency testified that it was not their intention to participate in a college preparatory program but to become State troopers. The participants in the Sitka academy evidently were informed only towards the end of the thirteen-week program that they would not be placed with the State troopers, but would instead be eligible to compete for positions from a pool of recruits.

1. The "steps" referred to are stages of the contractual grievance procedure.

2. The participants in the 1986 Sitka academy program were paid at rates consistent with APEA–GGU and were considered APEA–GGU

The State was faced with budgetary considerations in determining how best to utilize the Sitka academy. State officials determined that it was more advantageous to the State to create a pool of applicants from which the State could ultimately choose recruits as needed, rather than train trooper recruits directly. Under the State system an employee would be a trooper recruit within the PSEA bargaining unit only after completion of both the Sitka academy and the thirteen-week field training officer program.[2]

PSEA filed its unfair labor practice charge, based upon the reclassification, in October, 1986 and subsequently supplemented its pleadings. In its pleadings before the Agency, PSEA sought back pay, a cease and desist order preventing further reclassification of employees as proposed by the State, and other relief. The Agency held that PSEA's failure to comply with the contractual grievance procedure was excused by futility and, reaching the merits of the unfair labor practice claim, granted the requested relief. The Agency subsequently denied the State's motion for reconsideration.

■ The superior court reversed, holding that *Municipality of Anchorage v. Higgins,* 754 P.2d 745 (Alaska 1988) was controlling. In part the superior court held:

The policy of *Higgins* and other cited authority is that administrative agencies and courts should support grievance and arbitration agreements by declining jurisdiction until that procedure has been exhausted. Applying the *Higgins* rationale to the present situation requires the matter be remanded to the Agency and that an order be entered dismissing the unfair labor practice complaint on the ground that PSEA has not shown compliance with their contract with the State.

members. They were paid approximately $1,000 less per month as APEA–GGU members than they would have received as PSEA members. There were also differences in benefits and in the amount of union dues withheld.

We reverse.[3]

## II. DOES AS 23.40.210 REQUIRE EXHAUSTION OF CONTRACTUAL GRIEVANCE OR ARBITRATION PROCEDURES PREREQUISITE TO AGENCY JURISDICTION OVER AN UNFAIR LABOR PRACTICE CLAIM?

■■ The Agency gives "great weight" to federal decisions in the area of labor relations. 2 AAC 10.440(b).[4] We have looked to decisions of the National Labor Relations Board ("NLRB") in interpreting Alaska's labor laws.[5] Numerous cases decided under the Labor Management Relations Act ("LMRA"), 29 U.S.C.A. § 141 *et seq.* (1973), which grants federal courts jurisdiction to enforce the terms of collective bargaining agreements, *see id.* § 187, confirm that the NLRB has power to provide statutory remedies for unfair labor practices despite the availability of existing, non-exhausted, contractual grievance and arbitration processes. *See, e.g., Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964) (NLRB may, under express language of § 10 of the LMRA, adjudicate disputes otherwise arbitrable, and the Board also has discretion to decline jurisdiction in favor of contractual grievance mechanisms); *see also Collyer v. Insulated Wire*, 192 NLRB 837 (1971). The Board's power to refuse to defer to grievance and arbitration mechanisms is derived from § 10 of the LMRA, which provides in relevant part:

> The Board is empowered . . . to prevent any person from engaging in any unfair labor practice. . . . This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law or otherwise. . . .

29 U.S.C. § 160(a).

Alaska's Public Employment Relations Act ("PERA" or "Act")[6] contains no similar reservation clause. However, AS 23.40.210 provides, in relevant part:

> The [collective bargaining] agreement shall include a grievance procedure which shall have binding arbitration as its final step. *Either party to the agreement has a right of action to enforce the agreement by petition to the labor relations agency.*

(Emphasis added). On its face, this language does not explicitly answer the question whether adherence to the grievance mechanisms of a collective bargaining agreement is a mandatory prerequisite to the Agency's jurisdiction, or whether the Agency may exercise jurisdiction over unfair labor practice claims which are the subject of pending grievance procedures. AS 23.40.120, establishing the Agency's unfair labor practice jurisdiction, provides that the Agency *"shall* investigate" claims of unfair labor practices (emphasis added). Whether the Agency may adjudicate such

---

**3.** Where the issues require recourse to the particular knowledge and expertise of the Agency, or a determination of fundamental Agency policy, we employ the reasonable basis standard of review. *Tesoro Alaska Petroleum v. Kenai Pipe Line*, 746 P.2d 896, 903 (Alaska 1987). Under that standard, we will affirm the agency's decision if it is "supported by the facts and has a reasonable basis in law. . . ." *Id.* Alternatively, the court will use the substitution of judgment standard where the agency's expertise will be of little guidance to the court in determining the meaning of the statute. *Id.* When applying this standard, the court will not defer to the agency, but will use its own expertise in statutory interpretation to independently determine the meaning of the statute. *Id.* at 904.

Where, as here, the superior court acts as an intermediate court of appeal, no deference is given to its decision. *See, e.g., Tesoro*, 746 P.2d at 903; *Amerada Hess Pipeline Corp. v. Alaska Public Utilities Comm'n*, 711 P.2d 1170, 1175 (Alaska 1986); *National Bank of Alaska v. State, Dep't of Revenue*, 642 P.2d 811, 816 (Alaska 1982); *State v. Lundgren Pac. Constr. Co.*, 603 P.2d 889, 892 (Alaska 1979).

**4.** 2 AAC 10.440(b) states:

> Relevant decisions of the National Labor Relations Board and federal courts will be given great weight in determinations made under this chapter and AS 23.40.

**5.** *See, e.g., Alaska Public Employees Ass'n v. State*, 776 P.2d 1030, 1032 (Alaska 1989); *Alaska Community Colleges' Fed'n of Teachers, Local 2404 v. University of Alaska*, 669 P.2d 1299 (Alaska 1983); *Alaska Public Employees Ass'n v. Municipality of Anchorage*, 555 P.2d 552, 553 (Alaska 1976).

**6.** AS 23.40.070–23.40.260.

claims, despite contract provisions providing for grievance-arbitration procedures, is the issue for decision here.

The legislative history of AS 23.40.210 is not particularly enlightening.[7] Given the ambiguous language of the statute and the absence of relevant legislative history, we construe this statutory language so as to "adopt a rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

Under federal labor law, the NLRB has the authority to bypass contractual grievance processes and provide a statutory remedy in circumstances similar to those presented in the case at bar. Here PSEA alleges that the State committed unfair labor practices in violation of AS 23.40.-110(a)(1), (2) and (5) by unilaterally transferring employees in one bargaining unit to another unit without negotiation. In the words of the Agency,

> The State engaged in a prohibited practice within the meaning of AS 23.40 by reclassifying the State Trooper recruits to college interns III and IV during 1986 and redesignating those reclassified employees as members of the APEA–GGU bargaining unit rather than maintaining them within the PSEA bargaining unit. This practice violated the obligation to bargain in good faith with respect to terms and conditions, and constituted a unilateral change without appropriate bargaining concerning the position transfers from the PSEA bargaining unit to the APEA–GGU bargaining unit—violating AS 23.110(a)(5). The movement of employees from PSEA to APEA inter-

fered with any expectations or presumptions those employees may have had to remain within PSEA and benefit thereby—violating AS 23.40.110(a)(1)—and interfered with the existence of PSEA as a representative of designated employees—violating AS 23.40.110(a)(2).[8]

This Court has previously held that AS 23.40.110 prohibits essentially the same conduct prohibited by federal labor laws. In particular, we have held that paragraphs (a)(1) and (a)(3) of AS 23.40.110 are substantially similar to §§ 8(a)(1) and (a)(3) of the LMRA, 29 U.S.C. § 158(a)(1) and (a)(3). *Alaska Community Colleges' Fed'n of Teachers, Local 2404 v. University of Alaska*, 669 P.2d 1299, 1302 & n. 1 (Alaska 1983). We further note that AS 23.40.-110(a)(2) (employer may not "dominate or interfere with the formation, existence or administration of an organization") and (a)(5) (employer may not "refuse to bargain collectively in good faith") also prohibit conduct similar to that proscribed by LMRA §§ 8(a)(2) and (a)(5).

Under the LMRA, the NLRB has declined to defer to grievance arbitration processes in a variety of circumstances.[9] Historically, the Board has seen a series of changes in its deferral practices. In 1971 the Board appeared to adopt a relatively restrictive policy in favor of deferral in *Collyer Insulated Wire*, 192 NLRB 837, 77 LRRM 1931 (1971). There the Board articulated several factors influencing its determination to defer to grievance arbitration processes in a case involving an employer's unilateral alteration of working conditions, an alleged violation of § 8(a)(5).

---

7. House Bill 683 was passed as a rider to a minor amendment to the penalty provision of the Wage and Hour Act. *See* 1972 H.J. 1312 (May 22, 1972). Then Governor Egan sponsored the bill, but the historical materials give no indication as to the source of the text. *Id.* at 1321.

8. On appeal the superior court identified three distinct bases for PSEA's unfair practices claim: that the State had interfered with PSEA employees' right to organize under AS 23.40.110(a)(1); that the State had impeded PSEA's lawful representation of its union members in violation of AS 23.40.110(a)(2); and that the State had failed

to bargain in good faith as required by AS 23.40.110(a)(5).

9. *See, e.g., Admiral Merchants Motor Freight, Inc.,* 264 NLRB 54, 111 LRRM 1380 (1982) (Board will not defer to grievance arbitration mechanisms where employer unlawfully refuses to bargain); *Interlake, Inc.,* 253 NLRB 638, 106 LRRM 1004 (1980) (Board will not defer where it is alleged employer discriminated against employee for filing unfair labor practice charges); *Loral Corp. v. Loral Elec. Sys. Div.,* 253 NLRB 851, 106 LLRM 1061 (1980) (Board will not defer where it is alleged that employer unlawfully denied union's request for information).

The dispute arose within the confines of a long and productive collective-bargaining relationship; there was no claim of employer animosity to the employees' exercise of protected rights; the parties' contract provided for arbitration in a very broad range of disputes; the arbitration clause clearly encompassed the dispute at issue; the employer had asserted its willingness to utilize arbitration to resolve the dispute; and the dispute was eminently well suited to resolution by arbitration. In these circumstances, deferral to the arbitral process merely gave full effect to the parties' agreement to submit disputes to arbitration.

*United Technologies*, 268 NLRB 83, 115 LRRM 1044, 1050 (1984) (discussing *Collyer Insulated Wire*). In *General American Transportation*, 228 NLRB 808, 94 LRRM 1483 (1977), however, the Board "abruptly changed course,"[10] announcing that as a general rule it would decline to defer to contractual grievance arbitration procedures in cases where the alleged violations of provisions of the LMRA relates to employer interference with employees'

"right to self-organization ... [and] other concerted activity ..." (§ 8(a)(1) violations),[11] "discrimination in regard to hire or tenure of employment ..." (§ 8(a)(3) violations),[12] and in certain cases presenting allegations of employee unfair practices (which are not relevant to this appeal).[13] Under the Board's *General American Transportation* rule, unfair practice claims analogous to those presented to the Agency in the instant case likely would have been heard by the Board without deferral to contractual dispute resolution mechanisms, inasmuch as PSEA's complaints alleged, in part, claims premised on state law provisions analogous to § 8(a)(1).

Yet in the subsequent case of *United Technologies*, 268 NLRB 83, 115 LRRM 1049, 1051 (1984), the Board again reversed its deferral policy, departing from *General American Transportation* and resuscitating the *Collyer* Board's policy in favor of deferral, at least in cases arising under §§ 8(a)(1) (employer interference with employees' right to organize and engage in concerted activity) and 8(a)(3) (discrimination by employer with respect to terms and conditions).[14]

**10.** *United Technologies*, 268 NLRB 83, 115 LRRM 1049, 1051 (1984).

**11.** LMRA § 7, 29 U.S.C.A. § 157 (referenced in LMRA § 8(a)(1), 29 U.S.C.A. § 158(a)(1)) (1973).

**12.** LMRA § 8(a)(3), 29 U.S.C.A. § 158(a)(3) (1973).

**13.** *See generally United Technologies*, 115 LRRM at 1051.

**14.** The Board has not abandoned *United Technologies*, although subsequent Board decisions raise issues concerning the scope of the holding, particularly in cases arising under § 8(a)(5). In a case decided after *United Technologies*, the Board in *Martin–Marietta Chemicals*, 270 NLRB 821, 116 LRRM 1195 (1984), refused to defer to grievance arbitration procedures established by the AFL–CIO constitution where the employer had unilaterally consolidated two formerly independent bargaining units. However, in so holding, the Board relied upon a line of precedents holding narrowly that whether one bargaining unit is an "accretion" of another "is not a proper subject for determination through arbitration...." *See, e.g., Hershey Foods*, 208 NLRB 70, 85 LRRM 1312, 1313 (1974).

Subsequently, in *General Dynamics Corp.*, 271 NLRB 187, 117 LRRM 1013 (1984), the Board refused jurisdiction over an unfair practice claim under §§ 8(a)(1) and (a)(3), deferring to contractual grievance arbitration mechanisms. The complainant had filed a grievance in accordance with the contract, and had pursued the grievance through four of the five steps of the contractual process, but then sought to abandon his grievance in favor of invoking the unfair labor practice jurisdiction of the Board. Citing its recent decision in *United Technologies* for the proposition that "an allegation of a violation of Section 8(a)(1) of the Act should be deferred in circumstances which establish that · the parties' collective bargaining contract contained a broad grievance-arbitration provision clearly encompassing the unfair labor practice allegation," 117 LRRM at 1015, the Board held that "deferral is all the more appropriate ... where [complainant's] decision to withdraw his grievance indicated that his decision was based in essence simply on his conclusion that it would be less expensive and more convenient to pursue his unfair labor practice charge before the Board...." *Id.*

Thereafter, however, in *E.I. DuPont de Nemours & Co.*, 271 NLRB 1245, 117 LRRM 1111 (1984), the Board held that deferral to grievance arbitration procedures was inappropriate in a

Thus, under *United Technologies*, whether the Board viewed the facts of the instant case as presenting primarily an allegation of a § 8(a)(1) violation or as raising a § 8(a)(2) or (a)(5) claim could be determinative of the deferral policy the Board would apply.[15] As the foregoing discussion indicates, the Board enjoys substantial discretion to determine its own deferral policy under the LMRA.

State courts have held that a state labor agency need not defer to contractual grievance arbitration procedures where the state law counterpart of an unfair labor practice is alleged. Of particular interest is *Fasi v. State Public Employment Rel. Bd.*, 60 Haw. 436, 591 P.2d 113 (1979). There the Supreme Court of Hawaii was presented with circumstances substantially similar to those of the instant case. A union of public employees had filed a grievance based on a seniority clause of their collective bargaining agreement with the City and County of Honolulu. The grievance was pursued by the union through the first three of four contractual grievance arbitration steps. Subsequently, the Mayor of Honolulu, acting as the City's representative, filed a petition with the Hawaii Public Employment Relations Board seeking a declaration that the seniority clause was not illegal under an applicable statute. The ruling was expressly sought "in order to determine the validity of the griev-

ance...." *Id.* 591 P.2d at 115. The matter proposed for Board decision, therefore, was squarely within the ambit of the contractual arbitration language applicable to the grievance pending for resolution at stage four.

The Board entered a decision which "sustained the jurisdiction of the Board to respond to the petition and provide a declaratory ruling", *id.* at 114, despite the pendency of arbitral proceedings concerned with precisely the same question. In enforcement proceedings, however, the state circuit court reversed the Board's ruling on the ground that "the Board lacked jurisdiction to issue a ruling on the matter which was pending arbitration." *Id.* at 116. The circuit court concluded (as summarized by the Hawaiian high court) that

> the parties were bound by the collective bargaining agreement to submit the dispute to an arbitrator, who should first determine that he has jurisdiction and, if he should so determine, should proceed to decide the matter on its merits....

*Id.* at 116.

With the issues thus framed, the Supreme Court of Hawaii reversed, recognizing the Board's power to refuse to defer to contractual grievance arbitration mechanisms in the unfair labor practice case. Neither the existence of applicable arbitration processes, nor the inevitability of a measure of contractual interpretation by

---

dispute concerning an employer's refusal to furnish the union with certain information in violation of § 8(a)(5), because the issue in such cases is whether the information sought is necessary and relevant to the union's bargaining obligations, and does not involve interpretation of the collective agreement. The same rule was subsequently given effect in *Victor Block, Inc.*, 276 NLRB 70, 120 LRRM 1240 (1985), where the Board held that an employee need not grieve and arbitrate his § 8(a)(5) claim prerequisite to invoking the Board's unfair labor practice jurisdiction, when the employee has alleged that the employer unlawfully failed to adhere to the terms of a collective bargaining contract. These cases suggest that the Board might refuse to defer, despite *United Technologies*, in cases brought under § 8(a)(5). Since in the instant case the Agency held that an AS 23.40.110(a)(5) violation "form[s] the basis for this complaint," arguably Board decisions might suggest that the Board would pursue a policy of non-deferral.

**15.** Despite *United Technologies* it is clear that the NLRB has never lacked the power to refuse to defer under circumstances similar to those presented in the case at bar, and the Agency's refusal to defer here is consistent with NLRB decisions predating the *United Technologies* ruling. *See Art Steel of California, Inc.*, 256 NLRB 816, 107 LRRM 1325 (1981); *Ball Corp., Ball Plastics Division*, 257 NLRB 971, 108 LRRM 1031 (1981). Judicial decisions predating *United Technologies* also exemplify the Board's power to decline to defer. *See Office and Professional Employees Int'l Union, Local 425 v. NLRB*, 419 F.2d 314 (D.O.Cir.1969); *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *General Truck Drivers, Chauffeurs, Warehousemen and Helpers of America, Local No. 5 v. NLRB*, 389 F.2d 757 (5th Cir.1968); *NLRB v. Huttig Sash & Door Co.*, 377 F.2d 964 (8th Cir.1967); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584 (7th Cir.1965); *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

the state Board, was sufficient to deter the court from holding that

> The willful failure of an employer to observe the terms of a collective bargaining agreement is defined by [statute] as a prohibited practice, with respect to which [§ 89–5(b)(4)] empowers the Board, upon complaints by employers, employees, and employee organizations, to "take such action with respect thereto as it deems necessary and proper." Since the meaning and effect of a collective bargaining agreement must be determined by the Board in the course of determining whether an employer is in violation of the agreement and is engaging in a prohibited practice, the meaning and effect of the agreement between [the City] and [the Union] was a question which related to an action which the Board might take in the exercise of its powers. The applicability of [the unfair practice statute] to the collective bargaining agreement is therefore a question which was properly placed before the Board by the petition....

*Id.* at 117–18. Thus, construing a statute no more conclusive as to the issue than Alaska's Labor Relations Act, the Supreme Court of Hawaii held that Hawaii's Labor Board is not required to defer its unfair labor practice jurisdiction to pending grievance arbitration proceedings.[16]

The Agency's refusal to defer in the instant case was justified under the circum-

---

**16.** Some state courts have gone further, holding that a state labor agency must *not* defer to arbitration. In *Portland Ass'n of Teachers v. School Dist. No. 1,* 27 Or.App. 247, 555 P.2d 943 (1976), the Oregon Employment Relations Board had deferred to an applicable, bargained-for grievance arbitration process, holding that whether the claim asserted could be grieved under the contract had to be determined by an arbitrator in the first instance. *Id.* 555 P.2d at 944. The appellate court reversed, holding that the Board's statutory mandate *required* it to investigate and decide unfair practice cases:

> The initial issue is whether [the state Board] had a duty to determine if [the union's] complaint constituted a grievance under the agreement. The resolution of this issue turns upon the scope of [the Board's] duties as defined by ... the statute which prescribes the procedures to be followed by the agency. Upon the receipt of an unfair labor practice complaint, [the Board] is required to first investigate the complaint to determine whether a hearing on the complaint is warranted. ORS 243.-676(1)(b). After a hearing, [the Board] must then determine whether any person named in the complaint has engaged in or is engaging in any unfair labor practice charged in the complaint. ORS 243.676(2)(a). These requirements as applied to this case can only mean that [the Board] had to determine whether the District was required by the terms of the professional agreement with [the union] to process [the union's] complaint as a grievance. ORS 243.672(1)(g). It necessarily follows that in order to so determine, [the Board] was required to look to the professional agreement's definition of grievable matters.

*Id.* at 944–45. Similarly, in *Detroit Fire Fighters v. City of Detroit,* 408 Mich. 663, 293 N.W.2d 278 (1980), the court, interpreting a statute which did not directly address deferral, held that the Michigan Employment Relations Commission could not, upon being presented with allegations of unfair labor practices by a public employer, defer hearing of those charges until after private arbitration, even though the subject matter of the alleged unfair practices was arguably covered by the collective bargaining agreement. *Id.* 293 N.W.2d at 283. In so holding, the court stated:

> [O]ur Legislature has determined that our state's public policy is best served when public employment disputes, implicating statutory rights, are resolved under a system which provides a significant procedural, and appellate review, protections.

*Id.* This holding was reaffirmed in *Bay City School Dist. v. Bay City Educ. Ass'n, Inc.,* 390 N.W.2d 159, 165 (Mich.1986) ("Arbitration procedures have been deemed inadequate for the resolution of statutory rights under the [Michigan] PERA.").

The courts of Pennsylvania have reached a similar result. Construing a statute containing language equivalent to the reservation clause of § 10(a) of the LMRA, Pennsylvania courts have held that

> [W]here a party seeks redress of an unfair labor practice, "jurisdiction to determine whether an unfair labor practice has occurred and, if so, to prevent a party from continuing the practice is in the [Pennsylvania Labor Relations Board] and nowhere else." We cannot, therefore, conclude that the PLRB is powerless to investigate charges of unfair labor practices merely because a collective bargaining agreement exists under which grievance arbitration is available for the determination of issues similar to those upon which the charges are based.

*Pennsylvania Labor Relations Bd. v. General Braddock Area School Dist.,* 33 Pa.Cmwlth. 55, 380 A.2d 946, 950 (1977) (quoting *Hollinger v. Department of Public Welfare,* 365 A.2d 1245, 1249 (Pa.1976)); *accord Philadelphia Hous. Auth. v. Commonwealth, Pa. Labor Rel. Bd.,* 75 Pa.Cmwlth. 199, 461 A.2d 649 (1983).

stances. The Agency's decision to reach the merits of PSEA's unfair labor practice claim was premised on its view that requiring PSEA to follow the contractual dispute resolution agenda further "was very arguably a futile act." The Agency noted that Commissioner Sundberg had indicated clearly that in his view the dispute was not arbitrable,[17] thereby foreclosing step three of the grievance procedure, and that the Commissioner of Administration, whose opinion would have constituted step four, had previously rejected PSEA's position.

The Agency should not be prohibited in such circumstances from taking jurisdiction to decide whether the State has committed an unfair labor practice by unilaterally reclassifying unit employees, since only through a determination of the validity of the reclassification itself can the union challenge the Commissioner's ruling that the contractual grievance procedure did not apply to these employees. That is, Agency review of the unfair labor practice claim was highly desirable during the pendency of the grievance because it enabled the grievance process to proceed effectively.

In enacting PERA, the legislature granted to employee organizations a statutory right to invoke the Act's remedial provisions despite the simultaneous availability of grievance arbitration processes. For although AS 23.40.210 mandates that each collective bargaining agreement "shall include a grievance procedure which shall have binding arbitration as its final step," it further provides: "[e]ither party to the agreement has a right of action to enforce the agreement by petition to the [Alaska] labor relations agency." To hold that the availability of arbitration precludes an unfair practice proceeding before the Agency where such a proceeding is otherwise available would, as argued by PSEA, render the Agency's unfair practice jurisdiction superfluous, since the only instances in which it could be invoked would be situations where no collective agreement existed.

We have previously rejected the argument that the availability of arbitration precludes statutory remedies. In *Public Safety Employees Ass'n v. State*, 658 P.2d 769 (Alaska 1983), we held that under the Uniform Residential Landlord and Tenant Act (URLTA), AS 34.03.010–.380, "the existence of the arbitration remedy [does not] preclude[ ] the exercise of the statutory remedy." 658 P.2d at 774. In so holding, we observed that other state and federal courts have, "[i]n circumstances involving coincident arbitral and statutory avenues of relief, ... held that arbitration does not

---

17. We observed in *Municipality of Anchorage v. Higgins*, 754 P.2d 745 (Alaska 1988), that "as a general rule [parties to an employment contract are] required to exhaust ... contractually provided remedies before pursuing judicial relief." *Id.* at 747. However, we also recognized in *Higgins* that failure to exhaust contractual remedies may, in circumstances of futility, be excused.

In the instant case PSEA contended, and the Agency found, that

Step four was very arguably a futile act *even if* it was required to have been performed. . . . Step four required submission of a grievance to Commissioner of Administration. The Commissioner of Administration had previously (in letters drafted by the Division of Labor Relations) rejected PSEA's position in this matter.

(Emphasis in original.) Unlike in *Higgins*, here there was evidence that recourse to arbitration would have been futile, because Commissioner Sundberg's letter stated that the reclassified employees were not entitled to arbitrate under the PSEA–State Collective Bargaining Agreement. These facts distinguish the instant case from

*Higgins* and in our view furnish an adequate evidentiary basis for the Agency's holding that exhaustion would be futile due to the certainty of an adverse decision. Amicus points out that this case resembles *Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496 (9th Cir.1980). In *Aleknagik*, native Alaskan villages challenged the Secretary of the Interior's interpretation of a statute that would allow non-natives to occupy lands within their villages. The plaintiffs argued, and the court agreed, that the Secretary's position was "established" and that administrative appeals would be "futile." *Id.* at 500. The Secretary had "made clear" his position on the issue. *Id.* As an example of his views, the court quoted a memorandum, approved by the Secretary, espousing the legal position the natives contested. *Id.* Furthermore, the administrative boards which provided hearings were "foreclosed" from "overruling the Secretary's position," either by regulation or by self-imposed policy. *Id.* Similarly, Commissioner Sundberg's position that the trooper recruits were not within the PSEA bargaining unit effectively foreclosed relief through the contractual grievance and arbitration processes.

afford an exclusive remedy." *Id.* at 775.[18] We thus hold that in the case at bar the presence of grievance and arbitration provisions in the PSEA-state contract neither deprived PSEA of its statutory right to press its unfair practice claim before the Board, nor deprived the Agency of jurisdiction to hear that claim.

## III. WAS THE AGENCY'S FINDING THAT THE STATE COMMITTED AN UNFAIR LABOR PRACTICE SUPPORTED BY SUBSTANTIAL EVIDENCE?

The state contends that the record does not support the Agency's finding that the state committed an unfair labor practice in refusing to bargain in good faith with respect to the reclassification of PSEA employees.[19] Because the superior court concluded that our holding in *Higgins* required the Agency to defer to arbitration, it did not reach the question, raised by the state in its appeal to the superior court, as to the sufficiency of the evidence supporting the Agency's determination that an unfair practice had occurred. We therefore remand this issue to the superior court for further proceedings. *See Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 498 (Alaska 1988) ("Because the superior court did not reach this issue, we would ordinarily remand for further proceedings.").

## IV. CONCLUSION.

We hold that in the factual context of this case PSEA could invoke the independent remedial provisions of PERA. AS 23.40.210 does not require exhaustion of contractual grievance or arbitration procedures in every case, but instead vests the Agency with a measure of discretion to determine whether to decline jurisdiction

---

**18.** *See, e.g., Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 745, 101 S.Ct. 1437, 1447, 67 L.Ed.2d 641, 644, 656–57 (1981) (Under the Fair Labor Standards Act Congress intended to give individual employees the right to bring their minimum wage claims under the FLSA in court, and because these congressionally granted FLSA rights are best protected in a judicial rather than in an arbitral forum, petitioners' claim is not barred by the prior submission of their grievances to the contractual dispute-resolution procedures.); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 50, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147, 159 (1974) (Under the Civil Rights Act, "The distinctively separate nature of ... contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence."); *Airline Pilots Ass'n Int'l v. Northwest Airlines, Inc.*, 627 F.2d 272, 277–78 (D.C.Cir.1980) (Employees Retirement and Income Security Act); *Marshall v. N.L. Industries, Inc.*, 618 F.2d 1220, 1222–23 (7th Cir.1980) (Occupational Safety and Health Act); *Horne v. New England Patriots Football Club, Inc.*, 489 F.Supp. 465, 470 (D.Mass.1980) (same); *Johnson v. American Airlines, Inc.*, 487 F.Supp. 1343, 1344–46 (N.D.Tex.1980) (Age Discrimination in Employment Act). Several state courts have similarly refused to require arbitration when statutory rights are at issue. *Moss–American, Inc. v. Fair Employment Practices Comm'n*, 22 Ill.App.3d 248, 317 N.E.2d 343, 349 (1974) (arbitrator's decision in the area of discrimination does not foreclose authority of the Illinois Fair Employment Practices Commission); *School Committee of Hanover v. Curry*, 3 Mass. App. 151, 325 N.E.2d 282, 285 (1975) (arbitrator's decision "does not preclude further judicial review where statutory policies have been affected."), *aff'd*, 369 Mass. 683, 343 N.E.2d 144 (1975); *Mountain States Telephone & Telegraph Co. v. Commissioner of Labor*, 187 Mont. 22, 608 P.2d 1047, 1061 (1979) (State Maternity Leave Act creates "uniquely personal" rights that are not proper subjects for arbitration), *appeal dismissed*, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980); *Vaughn v. Pacific Northwest Bell Telephone Co.*, 40 Or.App. 427, 595 P.2d 829, 833 (1979) (claims under unlawful employment practices statute need not first be arbitrated "because plaintiff is not seeking a remedy for breach of the employment contract. Rather, she seeks enforcement of her statutory rights...."), *aff'd*, 289 Or. 73, 611 P.2d 281 (1980); *Bridgeton Educ. Ass'n v. Board of Educ.*, 132 N.J.Super. 554, 334 A.2d 376, 378 (1975) ("the fact that an act may constitute [an arbitrable] grievance does not foreclose a court from deciding if the same act also violates a statute"; statutory relief is additional to that provided in the collective bargaining agreement). *See also Barry v. Flint Fire Dep't*, 44 Mich.App. 602, 205 N.W.2d 627, 629, 630 (1973) (when employment related constitutional equal protection claim is alleged, grievance procedures need not be utilized).

**19.** A reviewing court will defer to an administrative agency's factual findings if they are supported by "substantial evidence." *Fireman's Fund Am. Ins. Co. v. Gomes*, 544 P.2d 1013, 1015 n. 6 (Alaska 1976). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1015.

pending arbitration or to adjudicate such disputes in furtherance of its statutory prerogative to investigate and remedy unfair labor practice claims. Here the Agency properly refused to defer jurisdiction.

Our holdings make discussion of the other issues raised by the parties unnecessary. Accordingly, the judgment of the superior court is REVERSED, and the case REMANDED to the superior court to determine whether the Agency's conclusion that the state had committed unfair labor practices is supported by substantial evidence.