**Richard ROMULUS, Appellant,**

v.

**ANCHORAGE SCHOOL DISTRICT,
Appellee.**

No. S–6441.

Supreme Court of Alaska.

Feb. 2, 1996.

John R. Strachan, Anchorage, for Appellant.

Howard S. Trickey and Andrena L. Stone, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellee.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MOORE, Chief Justice.

## I. INTRODUCTION

Richard Romulus (a pseudonym), formerly a Reserve Officer Training Corps (ROTC) instructor at Chugiak High School, appeals from a superior court decision affirming the Anchorage School Board's decision to terminate him for sexually abusing two students. We affirm in part, reverse in part, and remand.

## II. FACTS AND PROCEEDINGS

### A. The Discharge

In 1988, after a twenty-five year Marine Corps career, Richard Romulus was hired as an ROTC instructor at Chugiak High School. In the summer of 1991 Romulus became the subject of a criminal investigation. The Anchorage Police Department had been told by the parents of one of Romulus' students that Romulus had sexually abused their daughter and another Chugiak student. In August 1991, the Department informed the school district (ASD) of the investigation.

Tom Everitt, ASD's Executive Director for Labor Relations, summoned Romulus to an August 28 meeting. Everitt met briefly with Romulus and Chugiak's ROTC commander, but Romulus asked to postpone the meeting until he could obtain counsel. Everitt informed Romulus that he was suspended without pay until ASD gathered more information on the matter.

Romulus quickly obtained counsel, and the parties met again on August 30. At the meeting, Romulus, who had been interviewed by police, explained his version of the story to Everitt. He denied the allegations, and offered the results of a polygraph test that purported to demonstrate his veracity. Based on the seriousness of the allegations against Romulus and the police department's

recommendation that Romulus be kept away from students, Everitt extended the suspension pending the completion of ASD's investigation of the matter.

ASD's attorneys interviewed the Chugiak High School principals, the ROTC commander, and T.A. and M.F., the two students whom Romulus had reportedly sexually abused. Additionally, Everitt obtained items from the Police Department's investigation: transcripts of police interviews with Romulus, and transcripts of telephone conversations between T.A. and Romulus and between T.A.'s father and Romulus. ASD concluded that the allegations against Romulus were true, and issued a bill of particulars informing him of his termination.

B. *The Hearing and the Hearing Officer's Recommendation to the School Board*

Romulus requested and received an administrative hearing to contest his termination. Although ASD took the position that Romulus was not a "teacher," as that term was defined by the Alaska Code, Romulus received the type of hearing utilized in the termination of a non-tenured teacher. The school board (the Board) delegated to a hearing officer the responsibility of conducting the hearing and making a recommendation.

The hearing officer classified the testimony into four categories: *percipient witnesses* were Romulus, T.A., and M.F.; two *investigative witnesses* were labor relations director Everitt and an Anchorage detective; *verification witnesses* were two polygraphers who came to opposite conclusions as to Romulus' veracity and a counselor who testified that M.F. and T.A. were telling the truth because they exhibited psychological signs of sexually abused adolescents; and a number of *character witnesses* for Romulus.

M.F. testified that Romulus had made sexual advances toward her, including "boyfriend-type" hugs and kisses, since the beginning of the 1990–91 school year. The most serious accusation involved an evening in March 1991, when the ROTC students were at an overnight event at the school. M.F. needed to be home by midnight, and Romulus volunteered to give her a ride. Romulus began driving in the opposite direction from M.F.'s house, allegedly informing her that they were taking "the scenic route." According to M.F., Romulus began to fondle her, and later turned down a little-used, snow-covered road, where the truck became stuck. There M.F. performed oral sex on Romulus. M.F. informed T.A. of this event shortly after it occurred. A final incident involving M.F. occurred the following summer, when she was working as a camp counselor and was invited by Romulus to do laundry at his house. Romulus asked M.F. to again perform oral sex, but she refused. When she returned to camp, M.F. related this incident to T.A. in a letter.

T.A. testified that Romulus began making sexual advances toward her in April 1991. She recorded this incident in a contemporaneous diary entry. Several other instances of this behavior reportedly occurred between April and the end of the school year. In the most serious incident, near the end of the school year, Romulus allegedly partially undressed T.A., fondled her, and rubbed his genitals against hers. T.A. said she then began to cry and left the room. She told M.F. about this incident shortly after it occurred.

Romulus agreed that he had volunteered to drive M.F. home from the overnight ROTC activity at Chugiak and that his truck had gotten stuck in the snow on a little-used road far from M.F.'s home. He explained by saying that he had picked up two male hitchhikers as they left the school grounds and that they had asked for a ride to Peters Creek, the opposite direction from M.F.'s home. Romulus said that after dropping off the hitchhikers, he mistakenly turned down the snowy road and became stuck. Romulus denied M.F.'s allegations of sexual activity between them during the evening. Romulus also agreed that M.F. had come over to his house to do laundry in the summer of 1991, but he denied that he had made any advances during her several-night stay. Romulus denied all of T.A.'s allegations regarding sexual encounters at the high school.

M.F. and T.A. were best friends, and with one exception, they shared this information

only with each other.[1] In June of 1991, however, T.A. was discussing the topic of sexual abuse with a cousin, and confided the events involving Romulus. The cousin told her mother, who contacted church social workers, who informed T.A.'s mother. T.A.'s parents then contacted the police, who initiated the investigation.

An Anchorage detective described the criminal investigation. The police investigation began with interviews of T.A. and M.F. M.F. initially denied any sexual contact between herself and Romulus. In a second interview, however, M.F. told the police of the above-described allegations "for [T.A.]'s sake because she needed me to speak up and tell [the police] what had happened."

The police obtained warrants to record phone conversations between T.A. and Romulus, and between T.A.'s father and Romulus. In these conversations, Romulus indicated that he might have been aware of the accusations against him and repeatedly told T.A. that he did not want to discuss the issue over the phone.

During the conversations with T.A., Romulus denied her accusations but more frequently responded by claiming that he could not recall the incidents to which T.A. referred and that he "[did]n't know what [he] did" during the alleged incidents. In general, Romulus acknowledged only that he "got too close" to his students and deflected attempts to discuss the alleged incidents, claiming that because of alcohol and medication use during the 1990–91 school year, there were times when he "didn't use good judgement," "didn't know what [he] was doing," and "didn't really know what was goin' [on]."

Romulus put on the testimony of a polygrapher who stated that Romulus was telling the truth when he denied sexual contact with the students. A polygrapher from the Anchorage police department contradicted this testimony, explaining that Romulus' witness had employed an unreliable testing method and had misinterpreted his results. A mental health counselor, Pam Kirk, testified that

both M.F. and T.A. exhibited behavior consistent with girls who had suffered sexual abuse.

A number of character witnesses testified that Romulus could not have committed the acts alleged. These were Valerie Ekberg, a Chugiak teacher; Elizabeth Garrity, one of Romulus' students; Denise Garrity, Elizabeth's mother, who had met Romulus during an ROTC weekend event; and Don Houk, the ROTC commander at Chugiak. Additionally, a guidance counselor at Chugiak testified that Romulus had a good relationship with his students, and that she counseled approximately twenty ROTC students who were grief-stricken by the news that Romulus had been discharged.

The hearing officer gave virtually no weight to the investigatory witnesses, since they had done little more than interview the persons involved. He also disregarded the testimony of the "verification witnesses," finding the polygraph testimony "not sufficiently reliable." Additionally, he disregarded Pam Kirk's testimony as "unreliable," and deemed her not "particularly convincing" because her "credentials in the mental health field are weak, she has no Ph.D and she is not licensed as a psychologist."

The hearing officer was impressed, however, with the character witness testimony, noting that in his experience in dozens of child molestation cases, this evidence was "compelling in its positive aspects." Finally, with regard to the percipient witnesses, the hearing officer found that "[n]either [M.F. nor T.A.] did anything to indicate that they were lying," and that "M.F. is normally a truthful and candid person."

The hearing officer issued his recommendation to the school board, prefacing it with the caveat that "the School Board should carefully review this case because the weight of the evidence is very close. A different fact finder, viewing the same facts could reasonably reach a different conclusion than is reached herein."

1. M.F. reportedly told a boyfriend later in the year about the oral sex incident, but this person did not testify at the hearing.

The hearing officer concluded that Romulus should be reinstated, because ASD had failed to prove by a preponderance of the evidence that Romulus had engaged in the conduct alleged. This recommendation was based on four areas of evidence that the hearing officer found "inconsistent with the charges": (1) the character evidence in favor of Romulus; (2) the fact that Romulus had not confessed to the alleged acts during the taped phone conversations;[2] (3) the fact that the students did not report the incidents to the authorities themselves, and that M.F. initially denied having sexual contact with Romulus when interviewed by police; and (4) the fact that, in the hearing officer's view, "despite the best efforts of the school district to present corroborating evidence, none has been identified or presented."

### C. The School Board's Decision to Discharge Romulus

The Board rejected the hearing officer's recommendation. While the Board did not give "great weight" to Pam Kirk's testimony, it did find her testimony "helpful and worthy of reliance in some areas, particularly with regard to the typical or expected reactions of adolescent girls to sexual abuse situations." The Board also attached significance to the fact that although Romulus had not admitted to improper conduct during the taped telephone calls, he repeatedly expressed reluctance to discuss the matter over the phone, and "[s]ome of his denials were less than unequivocal"—i.e., his statements that due to alcohol and medication use, he could not remember all of his actions during the relevant period. Finally, the Board did not share the hearing officer's conviction that the character testimony was of great import. It reasoned that since none of the character witnesses had known Romulus well enough to be aware of his alcohol and drug problems, their opinions regarding his capacity for inappropriate sexual behavior were due little weight.

The Board concluded that the charges contained in the bill of particulars dismissing Romulus had been proved by a preponderance of the evidence. It explained its conclusions by reference to three areas of evidence.

First, the Board decided that M.F. and T.A. had no motive to fabricate their accusations. They had no vendetta against Romulus, but rather had admired him and had never reported his actions to the authorities or to an adult. Additionally, they had maintained their stories consistently over the two years it took to complete the hearing, which the Board found inconsistent with a hypothesis that the affair had been the result of adolescent whimsy. Second, the Board placed importance on documentary evidence that corroborated the students' charges: T.A.'s diary entry and the letter from M.F. to T.A. Each of these documents contained a contemporaneous account of one of the alleged incidents, written before the students spoke of the events to others. Finally, the Board disbelieved Romulus' account of the night when he and M.F. got stuck in the snow. It concluded that unless Romulus was looking for the "opportunity that M.F.'s allegations say he actually pursued," he would not have left the ROTC event of which he was in charge, where chaperons were readily available, to give M.F. a ride, picked up two unknown hitchhikers, and then taken them in the opposite direction from M.F.'s house.

The Board concluded that Romulus' due process rights had been safeguarded through the hearing, and affirmed his dismissal.

Romulus appealed the decision to the superior court, which found that (1) Romulus was barred from contesting his unpaid suspension because he had failed to exhaust the contractual remedies in his employment contract; (2) Romulus had suffered no due process violation; (3) Romulus had no cause to complain that the Board failed to follow the hearing officer's recommendation; and (4) the Board's decision was supported by substantial evidence, and therefore must be affirmed. Romulus appeals.

---

2. The hearing officer stated that in his experience, "such surreptitious phone calls are often successful at obtaining admissions from guilty suspects." He also concluded that "[t]here was no credible evidence that at the time of these conversations that [Romulus] was aware that he was being investigated."

## III. DISCUSSION[3]

### A. The Court Erred in Determining that Romulus is Precluded from Challenging His Suspension

The trial court found that Romulus had waived his right to a judicial hearing because he failed to exhaust his administrative remedies. "[W]hen grievance procedures are available, an employee must exhaust contractual or administrative remedies before pursuing a direct judicial action against the employer." *Pederson–Szafran v. Baily*, 837 P.2d 124, 128 (Alaska 1992); *see also Municipality of Anchorage v. Higgins*, 754 P.2d 745, 747 (Alaska 1988); *Eidelson v. Archer*, 645 P.2d 171, 175–79 (Alaska 1982). The court was correct in finding that Romulus was subject to ASD's "Exempt Employees' Administrative Procedures Manual" (Exempt Manual), and that he failed to use its grievance procedure.[4]

The requirement that an aggrieved employee exhaust administrative remedies is inapplicable, however, "where the administrative remedy is inadequate or where the pursuit of the administrative remedy would be futile due to the certainty of an adverse decision." *Eidelson*, 645 P.2d at 181. The ASD Exempt Manual provided that the "appeal of last resort" was to the school district's labor relations director; this was Tom Everitt, the very person who made the decision to suspend Romulus without pay. A grievance process appears futile when the person who ordered the adverse employment decision presides over its appeal. *See Public Safety Employees Ass'n v. State*, 799 P.2d 315, 323 n. 17 (Alaska 1990) (concluding that resort to remedies is futile when grievance process requires appeal to individual who has already voiced an adverse opinion on the issue in question). The futility of his administrative remedy excuses Romulus' failure to exhaust it.

Additionally, ASD never informed Romulus that under the Exempt Manual, he had ten days to grieve his unpaid suspension. ASD's failure to notify Romulus of the deadline gives rise to concerns that the court discussed in *Manning v. Alaska R.R. Corp.*, 853 P.2d 1120, 1123–24 (Alaska 1993).

In *Manning*, an administrative agency terminated Manning without informing him directly or telling him that the decision would be unappealable if not challenged within Rule 602's thirty-day limit. We noted that "surprise and injustice" would result if Appellate Rule 602(a)(2)'s deadline for appealing an administrative decision were applied to bar Manning's suit. We followed the *Manning* principle in *Skudrzyk v. Reynolds*, 856 P.2d 462, 463 (Alaska 1993), where a university professor was directly informed that he had been denied tenure, but was not told that Rule 602 would bar an appeal of this decision unless it was filed within thirty days.

Romulus was told he was suspended, but not informed that after ten days, he would be barred from contesting the adverse action. The "surprise and injustice" are no less in this case than in *Manning* and *Skudrzyk*, especially in view of the Exempt Manual's short ten-day grievance period. It is true that the holdings of *Manning* and *Skudrzyk* are based on Appellate Rule 521's directive that procedural rules should be relaxed when "surprise and injustice" would otherwise result, and that Rule 521 does not apply to the deadlines found in ASD's Exempt Manual. But Rule 521's directive finds its source in

---

3. A school board acts as an administrative agency with regard to personnel decisions. *Ballard v. Stich*, 628 P.2d 918, 920 (Alaska 1981). An agency's factual findings are reviewed under the substantial evidence test. Our review must determine whether or not the findings "are supported by substantial evidence, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Galt v. Stanton*, 591 P.2d 960, 963 (Alaska 1979) (quoting *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963)). On questions of law, however, we exercise our independent judgment. *Handley*

*v. State, Dept. of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

4. The Exempt Manual states that "any employee who feels that he/she has received inequitable or unjust treatment because of some condition of employment may personally, or through a representative, appeal for relief from that condition." The Exempt Manual sets forth a procedure by which such "appeals for relief," travel up the chain of command and end with the school district's executive director of labor relations.

basic due process considerations.[5] We hold here that, based on *Manning* and *Skudrzyk,* due process requires prior notice where an agency invokes a relatively brief time bar to block the administrative appeal of an employment termination decision.

In sum, the record indicates that Romulus was subject to the Exempt Manual and its grievance procedure. Romulus' failure to utilize it is excused, however, because use of the grievance procedure appeared futile, and because ASD failed to notify him of the ten-day grievance deadline, as required by due process.

### B. *Romulus' Unpaid Suspension Violated His Due Process Rights*

■ Romulus claims that the pre-hearing unpaid suspension violated his due process rights. He cites *Nichols v. Eckert,* 504 P.2d 1359 (Alaska 1973), as support for the proposition that he had a right to "continued employment and related benefits pending [a] hearing."

*Nichols* held that the due process rights of three teachers were violated when they were terminated without a hearing. 504 P.2d at 1363–64. In a concurring opinion, three justices concluded that the due process clause of the Alaska Constitution required that a hearing precede termination or suspension. *Id.* at 1366. The concurrence noted that there were some instances where the "immediate removal of the teacher from the classroom would be justified" before a hearing was held, and that in those instances, due process "would be satisfied by a procedure which provided for the suspension of the teacher with pay pending the prompt convening of a full hearing." *Id.*

The three justices explained their holding as follows:

> The suspension or discharge of a non-tenured teacher prior to the expiration of the term of his or her contract is a very serious matter and may cause substantial injury. Specifically, such suspension or discharge may cause economic hardship, create a stigma of incompetence and blemish the teacher's professional reputation, decrease the possibility of other educational employment opportunities, deny the teacher the chance to pursue a chosen professional activity, and disrupt an existing educational relationship between teacher and students.

*Id.*

Although Romulus was not a "teacher" as defined by statute, because of the nature of his job responsibilities, the reasoning of the three-justice concurrence applies to the facts of this case. As Romulus notes, his job was to instruct students, and the economic hardship, stigma, and professional disruption caused by his suspension and termination for sexual abuse were identical to or greater than that which motivated the *Nichols* concurrence. *See* 504 P.2d at 1366. Because of the nature of the charges against Romulus, his immediate removal from the classroom was justified. However, under *Nichols'* view of the requirements of Alaska's due process clause, Romulus' suspension should have been with pay. *Id.*

ASD resists this conclusion. It first argues that the above-quoted passage is not the holding of the case. It next claims that the concurring justices' conclusion depended on an applicable statute that granted teachers the right to paid suspension, a statute which is inapplicable here.

These arguments are unpersuasive. The *Nichols* concurrence is an authoritative statement of Alaskan constitutional law. A majority of the court joined the concurrence, and it has subsequently been cited as authority. *See Storrs v. Municipality of Anchorage,* 721 P.2d 1146, 1150 (Alaska 1986) (citing *Nichols* for the proposition that under Alaska's due process clause, police officer had right to hearing before termination), *cert. denied,* 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987). ASD also incorrectly characterizes the *Nichols* concurrence as a product of a statute that is inapplicable here. The concurrence did not locate its reasoning in any statutory right; rather, the justices

---

5. Due process requires an agency's adjudicative deprivation of life, liberty or property to be preceded by appropriate notice. *Wickersham v.*

*State Commercial Fisheries Entry Comm'n,* 680 P.2d 1135, 1144 (Alaska 1984).

made clear that they were construing the demands of due process as required by the state constitution. 504 P.2d at 1366.

ASD also argues that the interests of a school board justify its ability to suspend employees expeditiously and without pay, and that the informal pre-suspension meeting between Everitt and Romulus satisfied Romulus' due process rights. To support its contentions, ASD cites federal and out-of-state authority. Such authority is inapposite, because *Nichols* interpreted the requirements of the Alaska constitution.

ASD is correct to argue that its interest in protecting students justified its immediate suspension of Romulus, but it fails to demonstrate that the suspension was legitimately without pay. In fact, both of the pre-hearing suspension cases ASD cites required that a discharged employee be paid for the period between summary suspension and post-hearing discharge. *See Kenai Peninsula Borough Bd. of Educ. v. Brown,* 691 P.2d 1034, 1039 (Alaska 1984); *McMillan v. Anchorage Community Hosp.,* 646 P.2d 857, 864 (Alaska 1982).

*Nichols* foresaw situations such as the present one, where a teacher's immediate removal from a classroom required a suspension without a hearing; but it held that in such an instance, Alaska's Due Process Clause requires a paid suspension. 504 P.2d at 1366. We conclude that ASD should have paid Romulus during his suspension, which began on August 30, 1991.

ASD's claim that the informal pre-suspension meeting satisfied due process mischaracterizes the August 30 meeting. That meeting, during which Tom Everitt apprised Romulus and his lawyer of the charges against him, did not evaluate the merits of the charges or result in findings of fact. Rather, the meeting's purpose was primarily procedural; it served to ensure that Romulus knew of the charges he faced and to ascertain his initial response.

The duration of the period for which Romulus should be paid is unclear, however. In *Brown* and *McMillan,* the employee was to be paid for a relatively short period until he received a hearing where the legitimacy of his suspension and discharge was affirmed. *Brown,* 691 P.2d at 1039; *McMillan,* 646 P.2d at 867. *Cf. North Slope Borough v. Barraza,* 906 P.2d 1377, 1381–82 (Alaska 1995). By contrast, Romulus' hearing was not held until nearly two years after his discharge. The reasons for this delay are "not fully discussed in the record," but correspondence between counsel indicates that the delay was "with [Romulus'] agreement." Accordingly, ASD should be obligated to pay Romulus' salary not until the date of the actual hearing, as was the case in *Brown* and *McMillan,* but only until Romulus could have reasonably received a hearing, had he not consented to delay. We therefore remand this issue to the superior court for a determination of an appropriate date on which to terminate Romulus' paid suspension.

### C. The Board Did Not Violate its Procedures by Refusing to Follow the Hearing Officer's Recommendation

■ Romulus argues that ASD violated its own hearing procedures by rejecting the recommendation of the hearing officer and coming to its own conclusion regarding the facts in dispute. In support of this argument, he cites a District manual that states:

(F) The School Board (or hearing examiner pursuant to a delegation of authority from the School Board) shall have the authority to:

. . . .

(4) Make findings as to the credibility and demeanor of witnesses.

Romulus contends that when, as here, the school board appoints a hearing officer to administer a discharge hearing, the determination of witness credibility is the sole task of the hearing officer. He concludes that the Board was "procedurally compelled to adopt [the hearing officer's] character assessments finding ASD's three witnesses unbelievable, [and that] the Board cannot lawfully reverse" the hearing officer's conclusion that the charges against him had not been proved by a preponderance of the evidence.

As ASD notes, the problem with Romulus' argument is that "[t]he Board's decision is not in the form of an appellate review of the hearing officer's recommendation," wherein

the Board must accept the hearing officer's findings of fact unless clearly erroneous. Rather, ASD policy provides that "[r]egardless of the School Board's decision regarding [whether to employ] a hearing examiner, *only the School Board* shall make the final decision regarding ultimate findings of fact and conclusions of law relating to the dismissal or non-retention."

The passage Romulus relies on is one among several provisions generally setting forth the responsibilities of a hearing examiner.[6] These responsibilities translate into actions which ensure that the hearing examiner facilitates the creation of a record which is of maximum use to the Board. The manual designates the Board as the ultimate factfinder and administrative decision-maker. In light of the clear language of the Board's policy manual, we cannot agree that the passage cited by Romulus circumscribes the fact-finding powers of the School Board.[7]

Consequently, we reject Romulus' argument that the Board's refusal to follow the hearing examiner's recommendation violated District policy. Based on the foregoing discussion of the evidence presented at the hearing and the Board's reasons for discharging Romulus, we also hold that substantial evidence in the record supported the Board's decision.

### D. *The School District Applied the Proper Standard of Proof*

■ Romulus argues on appeal that the charges against him were not proved by clear and convincing evidence. He cites *In re Hanson,* 532 P.2d 303, 308 (Alaska 1975), which held that the clear and convincing standard applies to disciplinary hearings in-

volving a judge. He argues that there is no principled reason to hold a school district to a less stringent standard than that which applies to a committee dispensing judicial discipline. Romulus also cites cases dealing with deportation and notes that in these "quasi-criminal" administrative proceedings, the burden of proof is clear and convincing evidence. He argues that the instant case should be classified in the same category.

Case law from other jurisdictions, which we find persuasive, rejects Romulus' argument. When a school district initiates termination procedures against a teacher, courts widely apply the preponderance of the evidence standard, and rarely if ever impose a clear and convincing standard. *See, e.g., Forbes v. Poudre Sch. Dist. R–1,* 791 P.2d 675, 678–79 (Colo.1990) ("the party asserting charges against a teacher has the burden of establishing those charges by a preponderance of the evidence"); *Madril v. School Dist. No. 11,* 710 P.2d 1, 2–3 (Colo.App.1985); *Board of Educ. of Chicago v. State Bd. of Educ.,* 113 Ill.2d 173, 100 Ill.Dec. 715, 721, 497 N.E.2d 984, 990 (1986); *Board of Educ. of Melrose Mun. Sch. v. State Bd. of Educ.,* 106 N.M. 129, 740 P.2d 123, 125 (N.M.App. 1987).

■ The preponderance standard is also applied in out-of-state cases involving the firing of other types of public employees. *See Clark v. Board of Fire & Police Comm'rs,* 245 Ill.App.3d 385, 184 Ill.Dec. 509, 513, 613 N.E.2d 826, 830 (1993) (termination of police officer accused of obstruction of justice, bribery, and conspiracy); *Meyers v. Montgomery County Police Dept.,* 96 Md. App. 668, 626 A.2d 1010, 1029 (1993) (police officer fired for use of excessive force); *Jack-*

---

6. These responsibilities include scheduling, resolving discovery disputes and other motions, swearing in witnesses, ruling on evidentiary issues, and limiting repetitious testimony.

7. Moreover, as the Board noted in its findings, its disagreement with the examiner was "not based upon the demeanor of witnesses or other factors which the hearing officer might perceive through the receipt of live testimony." Rather, the Board's conclusions departed from those of the hearing officer in that (1) unlike the hearing officer, the Board found that T.A.'s diary and M.F.'s letter to T.A. constituted corroborative evi-

dence; (2) the Board deemed Romulus' denials of the allegations during the recorded phone conversations to be less than complete and indicative of a guilty conscience; (3) the Board rejected the value of the character witness testimony, since all of those witnesses were ignorant of a significant private fact of Romulus' life—his alcohol and drug problems; (4) the Board found Pam Kirk's testimony "helpful," despite the fact that she was not a licensed clinical psychologist; and (5) the Board found inherently implausible Romulus' account of how he got his truck stuck in a snowbank while giving M.F. a ride home.

*son v. Bible,* 611 S.W.2d 588 (Tenn.App.1980) (hospital worker fired for theft). These cases belie Romulus' claim that accusations of illegal conduct which prompt an employment termination proceeding must be proved by clear and convincing evidence. We follow them and hold that the preponderance of evidence standard applies to disciplinary proceedings involving a government employee.

### E. *The Lower Court Must Reconsider Its Award of Attorney's Fees*

The court's award of attorney's fees to ASD was appropriate, for the result the court reached. Because we reverse with regard to Romulus' unpaid suspension, however, we vacate the attorney's fees award. On remand, the trial court should determine who is the prevailing party, and award attorney's fees accordingly.

### IV. *CONCLUSION*

Romulus' failure to exhaust his contractual remedies is excused by their futility and by the fact that Romulus did not receive notice of the deadline for their exercise, so he is not precluded from challenging his suspension. Under the Due Process Clause of the Alaska Constitution, ASD should have continued to pay Romulus during the period of his suspension until he could have reasonably received a hearing. Romulus' other arguments lack merit. The Board's refusal to follow the recommendation of the hearing examiner was a proper exercise of its fact-finding powers as set forth in ASD's policy manual. The Board's decision to dismiss Romulus was supported by substantial evidence in the administrative record, and the substantial evidence test was the appropriate standard.

AFFIRMED in part, REVERSED in part, and REMANDED for determination of the length of the period for which Romulus was entitled to a paid suspension and for reconsideration of attorney's fees.