STATE of Alaska, and the Alaska
Housing Finance Corporation,
Appellants/Cross–Appellees,

v.

ALASKA STATE EMPLOYEES ASSO-
CIATION/AFSCME LOCAL 52,
Appellee/Cross–Appellant.

Nos. S–6600, S–6630.

Supreme Court of Alaska.

Aug. 2, 1996.

David T. Jones, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellants/Cross–Appellees.

Don Clocksin, Don Clocksin Law Office, Olympia, Washington, for Appellee/Cross–Appellant.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS, EASTAUGH, JJ., and CARPENETI, J. Pro Tem.*

*OPINION*

EASTAUGH, Justice.

## I. *INTRODUCTION*

This labor dispute arose after the Alaska legislature, in consolidating various state housing programs, transferred housing programs conducted by the Alaska Department of Community and Regional Affairs (DCRA) to the Alaska Housing Finance Corporation (AHFC). The Alaska State Employees Association (ASEA), the union which represented the former DCRA employees, filed unfair labor practice charges asserting AHFC and the State failed to bargain over the transfer and the terms and conditions of employment of the former DCRA employees. The Alaska Labor Relations Agency (Agency) found against the State and AHFC. On appeal the superior court (1) reversed the Agency's decision that the transfer law bound AHFC to honor the collective bargaining agreement covering DCRA employees when their positions where transferred to AHFC, but (2) affirmed the Agency's decision that AHFC is a successor employer that must bargain with the union. AHFC and the State appeal; the union cross-appeals. We affirm in part and reverse in part.

## II. *FACTS AND PROCEEDINGS*

### A. *Facts*

In 1992 the Alaska legislature consolidated state housing programs under AHFC. In

doing so, the legislature transferred housing programs administered by DCRA to AHFC, and merged the Alaska State Housing Authority (ASHA) into AHFC. Ch. 4, FSSLA 1992 (hereinafter "transfer law").

The Finance Committee of the Alaska House of Representatives introduced the transfer law on May 13, 1992, during a special legislative session. 1992 House Journal 4359–60. The House referred the bill back to the Finance Committee on the same day. On May 14, 1992, the Finance Committee recommended a substitute for the original bill; the House passed the substitute bill and transmitted it to the Senate. The House also adopted a Letter of Intent by a vote of 35–5 on May 14. The Letter of Intent stated:

> It is the intent of the Legislature that AHFC will abide by collective bargaining agreements in effect for Department of Community and Regional Affairs employees on the date of transfer. Said agreements shall remain in effect until their expiration on December 31, 1992, at which time AHFC shall honor its duty as successor employer to bargain with the affected employee groups.

1992 House Journal 4373. The Senate read the substitute bill on May 14 and May 15, and passed it on May 15. 1992 Senate Journal 3504, 3516, 3539–41. The Senate Rules Committee also approved the Letter of Intent on the same day. The Senate then returned the bill to the House for transmission to the Governor. 1992 Senate Journal 3541.

While the legislature was considering consolidation of the housing programs, ASEA representatives approached Senator Patrick Rodey, one of the sponsors of the transfer law, with their concerns about the impact of the legislation on the collective bargaining rights of the DCRA employees. The ASEA representatives asked Senator Rodey to add language to the legislation to ensure that the ASEA labor agreement covered the transferred DCRA positions. Senator Rodey later testified at the Agency hearing that such language was not added and that he believed "that it was thought that we didn't need to

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

put any more lightning rods in the legislation than ... was needed and that as long as the problem was solved, there was no ... need to memorialize it as a ... matter of statute."

On May 14 Senators Rodey and Jim Duncan met with Robert W. Sullivan, Intergovernmental Affairs Director at AHFC, and Eric Wohlforth, bond counsel for AHFC. Barry Hulin, Chief Executive Officer and Executive Director of AHFC, participated by telephone. As a result of this meeting, Sullivan wrote a letter to Senator Duncan, stating that AHFC agreed to honor the ASEA collective bargaining agreement until its expiration on December 31, 1992. The Sullivan letter, however, did not contain a promise to bargain with ASEA beyond the expiration of the existing agreement.

AHFC's Hulin authorized the letter to Senator Duncan. AHFC contends that Hulin believed he was authorizing a commitment by AHFC to honor the contract until its expiration, *if legally possible*. After the bill was passed, but before the Governor signed it into law, the Department of Administration informed AHFC that it did not believe AHFC could honor the ASEA contract.

After the legislature transmitted the bill to the Governor, the Attorney General's office reviewed the legislation and summarized its effect. The Attorney General informed the Governor that the affected DCRA employees would

> no longer be in the classified service, and therefore no longer [be] members of the general government (GGU) bargaining unit. Hence, while they, and other AHFC employees, are covered by the Public Employment Relations Act, these employees are no longer covered by the collective bargaining agreement between the GGU and the state.

Additionally, the Attorney General informed the Governor that the Letter of Intent adopted by the House did not have the force of law and that it was "not useful as legislative history, as it is directly contradictory to what the legislature actually did, which is remove the affected employees from the classified service and from their bargaining unit." Approximately two weeks later, the Governor signed the bill.

As a result of the transfer law, AHFC gained approximately 250 ASHA employees and 36 DCRA employees.[1] The Alaska Public Employees Association (APEA) represented 56 of the 250 former ASHA employees, who were primarily maintenance and custodial workers. The other approximately 200 former ASHA employees were unrepresented. After the merger, AHFC honored the existing APEA collective bargaining agreement, and recognized APEA as the representative for this specialized sub-set of former ASHA employees.

Most of the affected DCRA employees were part of the GGU while employed at DCRA, and they were represented by ASEA. The transferred DCRA positions are very similar to existing AHFC positions, and the two groups of employees now work side-by-side carrying out similar duties and functions. Nonetheless, AHFC employees are not part of the GGU, as they are in the exempt service pursuant to AS 18.56.070.[2] As a public employer, AHFC is governed by the Public Employment Relations Act (PERA), AS 23.40.070–.260. AHFC employees are not covered by a collective bargaining agreement.

AHFC did not abide by the terms of the ASEA contract for the former DCRA employees, nor did it bargain with ASEA.

---

1. Forty-one DCRA positions were transferred to AHFC but only 36 employees actually followed their positions to AHFC. While the DCRA *positions* transferred to AHFC, the employees were laid off and rehired by AHFC. The superior court stated in its decision that 41 DCRA employees and 170 ASHA employees transferred to AHFC. *State, Alaska Housing Finance Corp. v. Alaska State Employees Ass'n/AFSCME Local 52*, No. 3AN–93–10311 Ci. at 11 n.7 (Alaska Super., August 9, 1994). The discrepancy in the numbers is irrelevant to our analysis.

2. Alaska State Labor Relations Agency Order and Decision No. 1 at 12–13 (Feb. 2, 1973) certified the GGU as including all "general state government employees in the classified service," subject to a few enumerated exceptions. The classified service "consists of all positions in the state service not included in the exempt service." AS 39.25.100.

Consequently, the transfer to AHFC altered considerably the terms and conditions of employment for the former DCRA employees.[3]

### B. *Proceedings Below*

ASEA, as the representative for the employees formerly employed by DCRA, filed unfair labor practice charges against AHFC and the State of Alaska for their failure to bargain over the transfer and the terms and conditions of employment for the former DCRA employees. ASEA also petitioned the Agency for clarification that the former DCRA employees retained their membership in the GGU.

The Agency heard ASEA's consolidated unfair labor practice charge and unit clarification petition on April 15, 1993. The Agency held that AHFC was bound by the transfer law to honor the ASEA collective bargaining agreement, and that AHFC had a duty to bargain with ASEA under the successorship doctrine. The Agency ordered AHFC to bargain with ASEA upon its request. The Agency also held that the GGU remained an appropriate bargaining unit for the employees engaged in the job duties of the DCRA programs assumed by AHFC under the transfer law,[4] and clarified that the GGU included these employees. Alaska State Labor Relations Agency Order and Decision No. 164 at 21 (Sept. 17, 1993).

AHFC and the State appealed the Agency decision to the superior court. The superior court reversed the Agency's decision that AHFC was bound by the transfer law to honor the collective bargaining agreement covering DCRA employees at the time of their transfer to AHFC. The court affirmed the Agency's decision that AHFC, as a successor employer, is obligated to bargain with ASEA. The court also affirmed the Agency's decision that the bargaining unit remained appropriate. AHFC and the State

appeal the superior court's decision that AHFC is obligated as a successor employer to bargain with ASEA, and the court's clarification of the GGU to include former DCRA employees. ASEA cross-appeals the superior court's decision that the transfer law did not require AHFC to honor the terms of the collective bargaining agreement.

### III. *DISCUSSION*

#### A. *Did the Transfer Law Bind AHFC to Honor the Existing ASEA Collective Bargaining Agreement or Obligate AHFC to Bargain with ASEA?*

In holding that AHFC was bound to honor the ASEA collective bargaining agreement, the Agency relied upon what it regarded as the plain language of the statute, the legislative intent, and the fact that AHFC honored the APEA collective bargaining agreement for former ASHA employees. The superior court disagreed with this finding but held that it was not dispositive as to whether AHFC had an obligation to bargain.

■■■■ Because the superior court acted as an intermediate court of appeal, we give no deference to its decision. *Public Safety Employees Ass'n v. State,* 799 P.2d 315, 318 n. 3 (Alaska 1990); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987). As this is a question of statutory interpretation which does not involve the special expertise of the Agency, we apply our independent judgment. *Kodiak Island Borough v. State, Dep't of Labor,* 853 P.2d 1111, 1113 (Alaska 1993); *Union Oil Co. v. State,* 804 P.2d 62, 64 (Alaska 1990).

The key statutory section at issue is Ch. 4, § 142(a), FSSLA 1992. This subsection includes transitional provisions for the transfer of DCRA's housing programs to AHFC. Subsection 142(a) addresses the contracts, rights,

---

**3.** The changes included the following: loss of the right to binding arbitration of grievances; loss of a holiday; an increase in the work week from 37½ hours to 40 hours with no increase in pay, resulting in an approximate 7% decrease in hourly pay rate; a decrease in the net leave accrual rate; loss of access to the GGU Business Leave Bank and the GGU Legal Trust Fund; loss of a 3.1% cost of living wage increase; a de-

crease in the per diem rates; and different dress code requirements.

**4.** For sake of brevity we will refer to the persons filling these positions as former DCRA employees, even though the persons now employed in these positions may not have been employed by DCRA.

and liabilities assumed by AHFC under the transfer. It states:

> All contracts, rights, liabilities, bonds, notes, or other obligations of the Department of Community and Regional Affairs under former AS 44.47.370—44.47.560 and 44.47.635 created by or under a law amended or repealed by this Act and in effect on the effective date of this section, remain in effect notwithstanding this Act's taking effect, with all contracts, rights, liabilities, bonds, notes, or other obligations of the Department of Community and Regional Affairs incurred under former AS 44.47.370—44.47.560 and 44.47.635 becoming contracts, rights, liabilities, bonds, notes, and other obligations of the Alaska Housing Finance Corporation.

Ch. 4, § 142(a), FSSLA 1992.

The parallel provision that addresses the ASHA merger, section 141(a), does not qualify AHFC's assumption of contracts and other obligations by referring to specific statutory provisions.[5]

■ ASEA argues that the transfer law bound AHFC to assume the DCRA collective bargaining agreement, despite the language differences between the DCRA and ASHA transfer provisions, and despite the fact that the collective bargaining agreement was not "created by or under" statutes specified in the transfer law or by a law amended or repealed by the act. ASEA argues that the Agency's interpretation of the statute is correct and more consistent with legislative intent. The Agency found that the specific statutory references in section 142(a) are necessary in order to delineate the statutory sources of the specific DCRA programs that

were transferred to AHFC. Because ASHA totally merged into AHFC, Ch. 4, § 2(a), FSSLA 1992, no such references were necessary. ASEA argues that the clause "under former AS 44.47.370—44.47.560 and 44.47.635" only modifies the phrase "other obligations of [DCRA]," and that all contracts, including the ASEA collective bargaining agreement, remain in effect after the transfer.

■ ASEA contends that legislative intent supports its interpretation of the statute. We have rejected a mechanical approach to the plain meaning rule of legislative interpretation, and have adopted a sliding scale approach instead. *Marlow v. Municipality of Anchorage,* 889 P.2d 599, 602 (Alaska 1995); *State v. Alex,* 646 P.2d 203, 208 n. 4 (Alaska 1982). "Where a statute's meaning appears clear and unambiguous . . . the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent." *University of Alaska v. Geistauts,* 666 P.2d 424, 428 n. 5 (Alaska 1983).

The transfer law's statement of purpose supports a finding that the legislature intended to limit the transfer of DCRA responsibilities, assets, and liabilities to AHFC. Ch. 4, § 2(a) FSSLA 1992. In stating that it intended to create a successor corporation for ASHA by merging ASHA into AHFC, the legislature expressly excepted the transfer of DCRA programs from that merger. *Id.*[6] Furthermore, the findings the legislature made in support of the transfer law focused on consolidating programs to serve state housing needs more efficiently, and did not

---

5. Ch. 4, § 141(a), FSSLA 1992 provides:
TRANSITIONAL PROVISIONS RELATING TO MERGER OF ALASKA STATE HOUSING AUTHORITY. (a) All contracts, rights, liabilities, bonds, notes, or other obligations of the Alaska State Housing Authority created by or under a law amended or repealed by this Act and in effect on the effective date of this section, remain in effect notwithstanding this Act's taking effect, with all contracts, rights, liabilities, bonds, notes, or other obligations of the Alaska State Housing Authority becoming contracts, rights, liabilities, bonds, notes, and other obligations of the Alaska Housing Finance Corporation with the same limitations and provisions as under a contract, right, lia-

bility, bond, note, or other obligation of the former Alaska State Housing Authority.

6. Subsection 2(a) states:

Merger is the process by which two or more corporations are united by a transfer of the responsibilities, assets, and liabilities of all into one of them, with that one entity continuing in existence as the successor corporation. *Except for the provisions described in (b) [the transfer of DCRA programs]* . . ., the purpose of this Act is to direct the merger of the Alaska State Housing Authority . . . into the Alaska Housing Finance Corporation. . . .
(Emphasis added.)

include any findings concerning employee/employer relations. This rebuts ASEA's contention that the legislature intended to bind AHFC to the existing DCRA collective bargaining agreement. Rather, the legislative history indicates that, at best, the legislature settled for ambiguity with respect to this issue.

The record indicates that the legislature was aware of the issue potentially presented by the collective bargaining agreement. ASEA representatives brought the issue to the attention of the legislators backing the bill. These legislators met with AHFC representatives, and the House and the Senate Rules Committee directly addressed the issue in the House's Letter of Intent. The legislature could have enacted provisions in the transfer law that would have bound AHFC to honor the terms of the collective bargaining agreement for the former DCRA employees. Nonetheless, the transfer law itself does not require AHFC to honor the ASEA agreement. Instead, it explicitly limits AHFC's assumption of obligations and liabilities held by DCRA.

■ The House's Letter of Intent and the Senate Rules Committee's approval of that letter cannot serve as a substitute for formal enactment of these obligations.[7] The personal intentions of Senators Rodey and Duncan concerning the legislation, or subsequent testimony about the legislature's intentions, are also irrelevant to determining legislative intent.

[W]e are of the view that subsequent testimony of even the prime sponsor of a bill as to either his own understanding or the

legislature's understanding of the meaning of that bill should not be considered by a court in construing legislative intent. We do not wish to transform statutory construction into a parade of legislators' affidavits containing their perceptions of the meaning of a bill.

*Lynden Transport, Inc. v. State*, 532 P.2d 700, 716 (Alaska 1975) (alteration in original) (quoting *Alaska Pub. Employees Ass'n v. State*, 525 P.2d 12, 16–17 (Alaska 1974)).

ASEA has not met its heavy burden of proving legislative intent contrary to the plain language of section 142(a). We affirm the superior court's holding that the transfer law did not bind AHFC to honor the existing DCRA collective bargaining agreement, or obligate AHFC to bargain with ASEA.

**B.** *Did the Agency Lack a Rational Basis for Its Holding that AHFC Is a Successor Employer, that the GGU Remains an Appropriate Bargaining Unit, and thus that AHFC Is Obligated to Bargain with ASEA?*

**1.** *Standard of review*

■ When we review agency decisions that implicate special agency expertise or determine fundamental policies within the scope of an agency's statutory function, we apply the rational basis standard. *Alaska Pub. Employees Ass'n v. State*, 831 P.2d 1245, 1247 (Alaska 1992) (citing *Tesoro*, 746 P.2d at 903). Under this standard, we defer to the agency determination as long as it is supported by the facts and has a reasonable basis in law. *Tesoro* 746 P.2d at 903 (citing

---

7. We cautioned against giving undue weight to such documents when we wrote:

Our constitution imposes certain requirements of formality on legislative action. Article II, § 14 provides that no bill may become law until it has passed three readings in each house on three separate days, no bill may become law without an affirmative vote of a majority of the membership of each house, and the yeas and nays on final passage shall be entered in the journal. One purpose of these requirements is to ensure that the legislature knows what it is passing. Any passed bill is subject to veto by the governor. Article II, § 15 Alaska Constitution. Only bills are approved or vetoed, not the contents of the house and senate journals, or the tape recordings of

committee and floor debates. The legislature enacts laws by the passage of bills meeting the foregoing formalities. It may not enact a law or change one by committee report. Such a report may be useful in interpreting an enacted statute, but it is not itself the statute.

*North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 543 n. 11 (Alaska 1978). The Attorney General informed the Governor that the legislation would not protect the DCRA employees' collective bargaining agreement and that the House Letter of Intent did not have the force of law. This letter illustrates the proposition recognized in *North Slope* that gubernatorial approval or veto is limited to the actual bill and not extended to "the contents of the house and senate journals." *Id.*

*Kelly v. Zamarello*, 486 P.2d 906, 918 (Alaska 1971)). We must ensure that the agency "has taken a 'hard look' at the salient problems and has genuinely engaged in reasoned decision making." *Trustees for Alaska v. State, Dep't of Natural Resources*, 865 P.2d 745, 747 (Alaska 1993) (citing *Alaska Survival v. State, Dep't of Natural Resources*, 723 P.2d 1281, 1287 (Alaska 1986)). If the decision fails to consider an important factor, it will be regarded as arbitrary. *Trustees for Alaska*, 865 P.2d at 747 (citing the related case of *Trustees for Alaska v. State, Dep't of Natural Resources*, 795 P.2d 805, 809 (Alaska 1990)).

■ In this case, the Agency was required to analyze the successor employer doctrine and determine the appropriate bargaining unit under AS 23.40.090 of PERA. As both of these endeavors require agency expertise, we apply the rational basis standard of review.

As an initial matter it is important to point out that "[t]he Agency gives 'great weight' to federal decisions in the area of labor relations." *Public Safety Employees Ass'n*, 799 P.2d at 318 n. 4 (citing 2 AAC 10.440(b)). Nonetheless, the governing Alaskan statute, PERA, differs from federal labor law in some significant aspects. PERA dictates that in determining appropriate bargaining units, the Agency shall make those units "as large as is reasonable, and [that] unnecessary fragmenting shall be avoided." AS 23.40.090.[8]

### 2. *Doctrine of successor employers*

■ The successorship doctrine governs whether AHFC is obligated to bargain with ASEA. This doctrine states that when business operations and employees are transferred in such a way that the employing industry remains essentially the same after the transfer, successor employers are obligated to bargain with the labor representatives previously chosen by the transferred employees. *Northwest Arctic Regional Educ. Attendance Area v. Alaska Pub. Serv. Emp., Local 71*, 591 P.2d 1292, 1295 (Alaska 1979) (citing *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972)). In *Northwest Arctic* we stated that "[f]actors used to determine whether the employing enterprise has remained substantially the same include continuation of the same product lines, departmental organization, job functions, and continuity of the work force." *Id.* (citing *Burns*, 406 U.S. at 280 n. 4, 92 S.Ct. at 1578 n. 4). *Northwest Arctic* makes clear, however, that successor obligations will not be imposed despite the existence of all of these factors if the bargaining unit is no longer appropriate after the transfer. *Id.* at 1296. Therefore, the question of whether AHFC is obligated to bargain with ASEA turns upon whether the Agency reasonably found that (1) there was substantial continuity of product, departmental organization, job functions, and work force after the transfer, and (2) GGU remained an appropriate bargaining unit after the transfer.

■ The Agency made specific findings with respect to the continuity of the product line, departmental organization, job functions, and work force.[9] The Agency heard substantial testimony from transferred DCRA employees and AHFC administrators, and the record provides a reasonable basis for the Agency's finding of the continuity required to impose successor obligations.

AHFC argues that the Agency's decision is fatally flawed, however, because the Agency did not determine whether the GGU remained an appropriate bargaining unit. Specifically, AHFC argues that the Agency

---

8. The statute states:
 **AS 23.40.090 Collective bargaining unit.** The labor relations agency shall decide in each case, in order to assure to employees the fullest freedom in exercising the rights guaranteed by AS 23.40.070—23.40.260, the unit appropriate for the purposes of collective bargaining, based on such factors as community of interest, wages, hours, and other working conditions of the employees involved, the history of collective bargaining, and the desires of the employ-
 ees. Bargaining units shall be as large as is reasonable, and unnecessary fragmenting shall be avoided.

9. AHFC contends that the Agency's finding that the DCRA employees continued to work as a unit is clearly erroneous. We presume that this is an objection to the Agency's finding of continuity of work force. However, AHFC offers no argument or evidence to support this contention.

erroneously failed to consider employee preference and the requirements that the unit be "as large as is reasonable, and [that] unnecessary fragmentation shall be avoided:" AS 23.40.090.

### a. *Employee preference*

■■■■ In analyzing whether the bargaining unit remained appropriate, the Agency discussed the employee preference factor, and found that "there is not any evidence in the record of the desires of the employees" and that "[a]n election would be needed to determine the desires of the employees." Even though it did not determine the desires of the employees, the Agency concluded that the GGU remained an appropriate bargaining unit for the former DCRA employees. The State argues that the Agency erred in not determining the desires of the employees. In response, ASEA argues that it benefits from a rebuttable presumption of majority employee support.

The United States Supreme Court has held that a union will enjoy a rebuttable presumption of majority employee support if it was the chosen representative of a majority of the new employer's work force when they worked for their previous employer. *See, e.g., Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41, 107 S.Ct. 2225, 2234–35, 96 L.Ed.2d 22 (1987). In *Fall River Dyeing*, the Court explained that the presumption is triggered only when a majority of the new employer's work force was hired from the predecessor employer, and not merely when the new employer hired a majority of the old employer's work force. *Id.*; *see also* 1 Patrick Hardin, *The Developing Labor Law* 781–83 (3d ed. 1992 & Supp. 1995). ASEA argues that, although former DCRA employees do not constitute a majority of AHFC's work force, the presumption applies because the total number of new employees (former DCRA and ASHA employees) comprise a majority of AHFC's work force.

This argument is unpersuasive in light of the purpose of the presumption rule. In *Fall River Dyeing*, the Court stated that a presumption was valid because "[i]f the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation. This feeling is not conducive to industrial peace." 482 U.S. at 39–40, 107 S.Ct. at 2233. Further, the Court reasoned that an employer could easily avoid this presumption by not hiring a majority of its work force from one previous employer. *Id.* at 40–41, 107 S.Ct. at 2234–35. If a majority of the new employer's work force was not hired from the a single previous employer, it would undercut the Court's rationale that the employees "find themselves in a new enterprise that substantially resembles the old." Rather, employees who comprise a minority of the new work force could point to their minority status as the reason for the loss of a chosen representative. More fundamentally, employers that create a work force by hiring employees from various companies could not avoid the presumption of majority support if ASEA's interpretation of this rule were adopted. Thus, ASEA's interpretation of when the rebuttable presumption applies would eradicate the safeguard articulated by the Court that "to a substantial extent the applicability of *Burns* rests in the hands of the successor." *Id.* Consequently, we find that ASEA does not benefit from a presumption of majority employee support.

We therefore agree with the State's argument that the Agency erred in not determining and considering the desires of the employees as AS 23.40.090 required. On remand, the Agency should be directed to take this factor into account.

### b. *Size and fragmentation of bargaining unit*

■■■■ In deciding that the GGU remained an appropriate bargaining unit, the Agency did not address either the size or fragmentation of the bargaining unit. The Agency has previously recognized the importance of these factors:

> The differences between sec. 090 and the comparable sections of the National Labor Relations Act are significant.... [Sec. 090] imposed this mandate [that bargaining units shall be as large as is reasonable

and unnecessary fragmenting shall be avoided] on the Labor Relations Agency, a mandate that is nowhere to be found in the National Labor Relations Act.... [I]t seems that the legislature acted in full knowledge of the fact that in a state of Alaska's geographical immensity, with but a small population, undue fragmentation of bargaining units could only frustrate collective bargaining.

Alaska State Labor Relations Agency Order and Decision No. 1 at 3–4 (Feb. 2, 1973). Consideration of these factors is required by the statute. AS 23.40.090 ("Bargaining units *shall* be as large as is reasonable, and unnecessary fragmenting *shall* be avoided" (emphasis added)).[10]

We recently held that "where a decisional document shows on its face that an important factor was not considered, the court should remand the matter for further consideration." *Keane v. Local Boundary Comm'n*, 893 P.2d 1239, 1245 (Alaska 1995) (citing *Southeast Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 548–49 (Alaska 1983)). Because determining the appropriateness of bargaining units involves Agency expertise, we remand for Agency analysis of this issue, with instructions to consider whether the resulting bargaining unit is as large as is reasonable and to ensure that unnecessary fragmentation is avoided.

## C. Did AHFC Voluntarily Assume the ASEA Collective Bargaining Agreement?

 Even if it is a successor employer, AHFC is not necessarily bound by the existing collective bargaining agreement. *Northwest Arctic*, 591 P.2d at 1296 (stating that there are only limited situations in which it is appropriate to bind a successor employer to a preexisting collective bargaining agreement). Although neither the lower court nor the Agency addressed this issue, we consider ASEA's argument that AHFC voluntarily assumed the bargaining agreement. In *Ransom v. Haner*, 362 P.2d 282 (Alaska 1961), we stated:

[I]t is a rule of law that an appellee may urge, and the appellate court should consider in defense of a decree or judgment any matter appearing in the record, even if rejected below and even if appellee's argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.

*Id.* at 285; *see also Alaska State Employees Ass'n v. Alaska Pub. Employees Ass'n*, 825 P.2d 451, 458 (Alaska 1991).

In support of its voluntary assumption argument, ASEA relies upon statements made during the meeting between Senator Duncan and AHFC administrators and upon the resulting AHFC letter to Senator Duncan. ASEA also relies upon statements made to DCRA employees by Bob Brean, then the director of DCRA's Division of Community and Rural Development, that the bargaining agreement would be honored. ASEA does not assert that Brean's statements were made on behalf of AHFC, nor is it clear that he was speaking for AHFC when he made them.[11]

10. Furthermore, even though the federal statute does not require analysis of size and fragmentation, the significance of these factors is not lost on the federal courts. The Ninth Circuit recognized that "[w]hen the unit is over-inclusive, several dangers exist.... [C]onflict might ... lead to instability in employer-employee relations." *Pacific Southwest Airlines v. NLRB*, 587 F.2d 1032, 1045 (9th Cir.1978) (citing *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 172–73, 92 S.Ct. 383, 393–94, 30 L.Ed.2d 341 (1971)).

11. ASEA also seems to offer AHFC's actions vis-a-vis ASHA employees either as proof of AHFC's *statutory* assumption of the ASEA agreement or as proof of AHFC's *voluntary* assumption of it.

ASEA states that "AHFC essentially acknowledged [that the statute obligates it to honor the ASEA agreement] ... when it agreed to honor the ASHA collective bargaining agreement." AHFC's actions with respect to ASHA employees are not probative of the legislature's intentions regarding AHFC obligations to DCRA employees. Whatever AHFC's interpretation of the statute, it is irrelevant to the meaning intended by the legislature.

Furthermore, AHFC's actions with respect to one bargaining agreement and union representative do not support a claim it voluntary adopted an entirely separate agreement. AHFC's adoption of the ASHA agreement would not support a reasonable belief by DCRA employees that AHFC had adopted DCRA's bargaining agreement.

Barry Hulin, then Executive Director of AHFC, authorized the letter to Senator Duncan which committed AHFC to honoring the ASEA agreement until its expiration on December 31, 1992. AHFC argues that this letter was meant to memorialize their promise to *attempt* to maintain the terms and conditions of employment for the DCRA employees until the end of 1992, *if legally possible.* The letter, however, contained no such conditional language. Based on advice from the Department of Administration that AHFC could not abide by the terms of the ASEA agreement, AHFC did not honor the promise contained in its letter to Senator Duncan. However, AHFC did not provide ASEA with the Department of Administration's reason why AHFC could not voluntarily abide by the terms of the ASEA agreement. Nor does AHFC articulate on appeal any reasons why it could not legally abide voluntarily by the agreement's terms. Because we have not been apprised of any legal impediments to AHFC's voluntary assumption of the collective bargaining agreement, we hold that AHFC's failure to fulfill its promise was unexcused. Consequently, on remand the superior court should award the former DCRA employees compensation for AHFC's breach of its promise to abide by the terms of the collective bargaining agreement until December 31, 1992.[12]

## IV. CONCLUSION

For the reasons discussed above in Part III.A, we AFFIRM the superior court's holding that AHFC was not bound by the transfer law to honor the existing ASEA collective bargaining agreement or obligated to bargain with ASEA over the terms and conditions of employment for the former DCRA employees.

For the reasons discussed in Part III.B, we VACATE the decision of the superior court that AHFC as a successor employer is obligated to bargain with ASEA and that the GGU remains an appropriate bargaining unit for the former DCRA employees. These questions must be remanded for Agency consideration in light of the statutory factors concerning employee preference, unit size, and avoidance of unnecessary fragmentation.

For the reasons discussed in Part III.C, we further hold that AHFC voluntarily assumed the obligation to honor the ASEA agreement until it expired on December 31, 1992. We REMAND to the superior court for an award to the former DCRA employees of the compensation they would have earned

---

12. We do not have the collective bargaining agreement before us. If the agreement has a provision requiring "follow-on" bargaining at its expiration, we hold that AHFC is not bound to this provision. The letter to Senator Duncan expressly limited AHFC's obligation to honoring the agreement until December 31, 1992. AHFC did not otherwise act so as to bind itself to a greater obligation.

The National Labor Relations Board has held that an employer can adopt some terms of an agreement and not be bound to the entire agreement. *All State Factors,* 205 N.L.R.B. 1122, 1973 WL 4421 (1973). In *All State Factors,* the Board held that an employer had not voluntarily adopted an existing bargaining agreement, despite its continuation of some of the agreement's benefits, because it refused to acknowledge a total adoption and only honored terms of its choosing. *Id.* at 1127. In arriving at this decision, the Board stated that *"Burns* ... counsels utmost restraint in applying an adoption theory, absent clear and convincing evidence of consent, either actual or constructive." *Id.* The Board noted that as a result of negotiations between the employer and the union, the employees were able to secure certain benefits through the employer's agreement to apply provisions that were advantageous to it. *Id.* The Board concluded, however, that "[w]hile the [employer], by its conduct, gave tacit, if not explicit, recognition to the Union, and negotiated with it on a variety of problems related to the transition," the record on the whole did not support a finding of constructive adoption of the agreement. *Id.*

The circumstances in *All State Factors* approximate the situation between AHFC and ASEA. ASEA sought and received a limited promise from AHFC that it would honor the agreement until its expiration. However, AHFC did not expressly promise to adopt an ongoing obligation to bargain with ASEA over the terms and conditions of employment for the former DCRA employees. ASEA has not provided clear evidence of constructive consent by AHFC to do so. Because "[t]he Agency gives 'great weight' to federal decisions in the area of labor relations," we adopt the NLRB's clear and convincing evidence rule for the adoption of labor agreements. *Public Safety Employees Ass'n v. State,* 799 P.2d 315, 318 (Alaska 1990) (citing 2 AAC 10.440(b)).

but for AHFC's breach of this promise.[13]

---

**13.** ASEA additionally argues that the State is bound to honor the collective bargaining agreement because the terms of the agreement provide for maintenance of benefits if employees are transferred. ASEA alleges that the former DCRA employees were to be transferred, but instead were laid off and rehired when these rights under the contract were discovered. ASEA implies a bad faith breach of contract, but on appeal it does not specifically state a claim nor does it cite any authority. Although *Ransom* allows this court to consider arguments rejected or ignored by the court below, review of this issue is not warranted because it is not clear that it was raised below and because ASEA has not provided sufficient factual or legal support to permit review. *Ransom,* 362 P.2d at 285; *see also L.E. Spitzer Co. v. Barron,* 581 P.2d 213, 218 (Alaska 1978) ("[If a] point is not given more than cursory statement in the argument portion of the brief, such point will not be considered by the Supreme Court.") (alteration in original) (quoting *Lewis v. State,* 469 P.2d 689, 691–92 n. 2 (Alaska 1970)).